**CENTER FOR AUTO SAFETY, et al., Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION, et al., Defendants.**

Civ. A. No. 84–0056.

United States District Court, District of Columbia.

April 25, 1984.

**1246**

Abbe David Lowell, Stanley M. Brand, Brand, Lowell & Dole, Washington, D.C., for plaintiffs.

Neil H. Koslowe, U.S. Dept. of Justice, Washington, D.C., for defendants.

1. The Center for Auto Safety is a consumer organization some of whose members have purchased defective General Motors automobiles. There are also three individual plaintiffs. Defendants are the Federal Trade Commission and its five commissioners.

2. *In the Matter of General Motors Corporation,* Federal Trade Commission Docket No. 9145. The case involves complaints about possible

## MEMORANDUM

HAROLD H. GREENE, District Judge.

In this action, plaintiffs [1] request the Court to declare improper the participation of James Miller, III, Chairman of the Federal Trade Commission, in the so-called GM defects case.[2] In that proceeding, the Commission, by a 3–2 vote, approved a consent decree which provided for arbitration conducted by the Better Business Bureau in lieu of the direct reimbursement relief which had apparently been standard in other proceedings of this type. If Miller had recused himself, at 2–2 tie would have resulted and, under the Commission's procedures, the consent decree would not have been approved.

The request for recusal arises out of Chairman Miller's relationship with Economic Impact Analysts (EIA), an economic consulting firm whose largest client was General Motors. In addition to asking that Miller be ordered recused, plaintiffs also request that the GM defects case be remanded to the Commission for *de novo* consideration without Miller's participation. Presently pending before the Court are cross motions for summary judgment.

### I

■ It is useful initially to state what is not involved here. Plaintiffs do not argue that Chairman Miller is disqualified on account of a present or *actual* conflict of interest. See 18 U.S.C. §§ 207, 208. Their sole claim is that Miller's participation in the GM defects case gave the *appearance* of a conflict of interest, and it is on this basis that they request that he in effect be ordered to recuse himself, retroactively,

transmission and engine defects in some 4 million General Motors automobiles manufactured between 1975 and 1980. Since his appointment to the FTC, Miller participated also in two other cases involving General Motors: the GM/Toyota joint venture (FTC File No. 821–0159) and the GM fleet discount case (FTC Docket No. 9114).

from that case.[3] It is settled law, not disputed by either party, that the appropriate legal standard to be applied in a case such as this is abuse of discretion. See *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982); *Blizard v. Frechette*, 601 F.2d 1217, 1221 (1st Cir.1979). It is also clear, however, that, as plaintiffs put it, that "there is little precedent or guidance concerning what [appearance of conflict] means or how it is to be applied."[4]

Factually, plaintiffs' claim consists of two principal elements. One of these revolves around the relationships among Miller, EIA, and General Motors; the second relies on a number of precedents involving high-level executive officials who, it is said, recused themselves in circumstances similar to those presented here.

## II

 The crux of plaintiffs' case against Miller may be summarized as follows.[5] Prior to his appointment as Chairman of the Federal Trade Commission, Miller was chairman of EIA. During the period of his association with that consulting organization, the firm did a substantial amount of work for General Motors; indeed, GM was EIA' largest client, and in the two years preceding the Miller appointment to the FTC, EIA billed General Motors for over $75,000 in consulting fees. Miller received some of these funds during his service as Chairman of the FTC. Further, although EIA is now dormant, it continues to exist, and Miller has not excluded the possibility that he will return to it after his term with the FTC expires.

While these facts, as well as those surrounding the collateral charges summarized in note 5 *supra*, appear at first blush to lend substantial support to plaintiffs' position, they are less persuasive when viewed in their appropriate context.

First. Miller recused himself from all decisions involving General Motors for a period of two years following the date EIA received its last payment from General Motors. His participation in the GM defects case must be viewed, therefore, in light of the passage of an appreciable period of time following the severance of his relationship with EIA and indirectly from General Motors. Unless Miller were to be regarded as being tainted by those relationships on a permanent basis, the two-year hiatus would appear to be, absent other factors, a reasonable prophylactic measure.

Second. EIA did receive substantial amounts from General Motors for consulting services. However, even so, these fees constituted only between 12 and 25 percent of Miller's income, for during the periods in question he also held a full time, salaried position with the American Enterprise Institute, and his salary from that position provided the bulk of his income.[6]

Third. Monies did continue to come to Miller from EIA during 1981 and 1982 while he was already working for the FTC.

**3.** Miller's participation is said to have created an appearance of a conflict in contravention of the standards established (1) by general principles of administrative law; (2) by FTC regulations codified in 16 C.F.R. § 5.10; and (3) by principles stemming from 18 U.S.C. § 208, the federal conflicts statute. The general thrust of these contentions is considered in the text below. However, it must be observed that these standards are themselves in some doubt as sources of authority for this controversy. For example, regulations such as section 5.10 have been held not to establish a test to be applied by the courts for the invalidation of agency decisions. *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed.Cir.1983). As for section 208 of the Criminal Code, it has no application at all

because Miller has no present interest in General Motors.

**4.** Plaintiffs' Memorandum at 12. In that sense, this case may be viewed as one of first impression. Plaintiffs' Memorandum at 2.

**5.** Plaintiffs also rely on such other matters as Miller's favorable references to GM, his relationship with several GM officials, and his testimony before the U.S. Senate during his confirmation hearings. Whether viewed singly or in the aggregate, they do not substantially advance plaintiffs' claim.

**6.** Contrary to plaintiffs' intimations, therefore, Miller cannot be equated with an official or employee of GM.

However, all of these monies represented income which EIA itself had received prior to Miller's entry into government service, and they were paid out to Miller during these two years only on a deferred income basis. Even with respect to these funds, only a small amount can be traced to EIA income from General Motors.[7]

■ Fourth. Plaintiffs point out that the consent decree which was approved with Miller's vote was favorable to General Motors. The Court rejects this fact as a basis for disqualification or recusal. The decree was negotiated and recommended to the Commission by its career staff without any participation by Miller.[8] Beyond that, however, public policy dictates great caution regarding the attribution of weight for disqualification or recusal purposes to the final outcome of a case. Reliance upon such considerations is to invite challenges to officials based not upon true conflicts of interest but upon their philosophical or ideological leanings [9] or, worse, upon the result that would be brought about by the removal of a particular official from the consideration of a particular controversy.[10]

Fifth. Potentially the most serious problem is Miller's refusal to rule out a return EIA. As indicated *infra*, several officials have recused themselves from controversies arising during their government service when the entities involved in these controversies—usually law firms—were organizations to which they intended to return. However, one fact is present here which takes the present situation out of this norm: EIA is not an organization having a continuous life; it is at present not even a going concern. It is dormant, and it is dormant precisely because EIA *is* Miller.[11] Thus, when Miller states that he may return to EIA, he is only saying that he will go back to being in essence a sole practitioner consultant. To require him to pledge that he will not return to EIA, therefore, as a condition of sitting on GM cases during his FTC service, is the equivalent of requiring him to pledge that he will not return to consulting work.[12] Neither the recusal precedents nor the principles underlying the recusal rules require such draconian relief.

In sum, the specific incidents upon which plaintiffs rely are not nearly as menacing as they might appear when viewed outside their appropriate context.

### III

Plaintiffs contend next that Miller's failure to recuse himself departs significantly from the standards applied by other high officials in similar situations, and that, in the words of the usual recusal test, this departure from accepted standards would lead a reasonable person with the knowledge of all the facts to conclude that his impartiality might reasonably be ques-

---

**7.** Moreover, as noted, during the 1981–82 period, while he was receiving this EIA income, Miller was recusing himself from all GM controversies coming before the Commission.

**8.** Defendants contend, and plaintiffs do not dispute, that Miller had no contact with the staff concerning this case before the staff recommendation was made to the Commission. See 16 C.F.R. § 4.7.

**9.** Those familiar with the personalities at the Federal Trade Commission might well agree with Commissioner Michael Pertchuk who has stated that

I don't have the slightest doubt that [Miller's] decision will be driven solely by his economic philosophy, and his views of the law, not by his lingering fondness or appreciation for General Motors.

Attachment D to defendants' Statement of Points and Authorities.

**10.** It is interesting to note in this connection that plaintiffs did not file this lawsuit until well after the proceedings were concluded and Miller had cast his vote.

**11.** EIA is a Subchapter S corporation; Miller and his wife are the sole stockholders.

**12.** The situation with respect to Miller's return to EIA does not differ substantively from his establishment, following his government service, of a new consulting firm named, say, "Miller Impact Analysts." Indeed, it may be that the slight future advantage to Miller from the existence of the EIA corporate shell would be outweighed by the attraction of clients through use of the now prominent Miller name in this hypothetical new consulting firm.

tioned. *United States v. Haldeman,* 559 F.2d 31, 132–33 n. 247 (D.C.Cir.1976); *C.J. Trotter v. Int'l. Longshoreman's Union, Local 13,* 704 F.2d 1141, 1144 (9th Cir. 1983); *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1111 (5th Cir. 1980).[13]

■ In support of this contention, plaintiffs cite the recusal policies of sixteen high-level officials which, they claim, suggest that these individuals would not have participated in the GM defects case had they been in Miller's position. But here again plaintiffs' broad brushstrokes reveal imperfections when subjected to closer examination.

A number of the officials on whose actions plaintiffs rely[14] promised only to recuse themselves from controversies directly involving their former companies; they made no reference whatever to controversies involving clients of these companies. These precedents thus stand only for the proposition that Miller should not have sat on cases involving EIA—and no claim is made that he did—they do not suggest that

he should have recused himself from a case involving EIA's client General Motors.

The cases involving seven of the other officials likewise presented fact patterns quite different from those presented here.[15] With respect to some of these cases, the difference with the instant proceeding is immediately apparent; with respect to the remainder that difference lies in the fact that here the former employer (EIS) is not at all representing a party (GM) before the particular agency (FTC), let alone in the very controversy at issue (the GM defects case). Because the facts are different, none of these precedents is controlling.

The precedents involving the remaining four officials[16] in the two most recent Administrations[17] are considerably more relevant. Former Attorneys General ·Griffin B. Bell and Benjamin R. Civiletti, former Assistant Attorney General John H. Shenefield, and former Deputy Attorney General Edward C. Schmults all promised to recuse themselves from cases involving clients of their former law firms, and there is thus a factual parallel to the claim that Miller should have recused himself because of his

---

**13.** If officials could be forced to disqualification or recusal on the basis of a lesser standard, not only could decisionmaking be disrupted by frequent challenges but it might be difficult for the government to employ policymakers who had the requisite knowledge of the particular subject matter.

**14.** Secretary of State George P. Shultz; Secretary of Labor Raymond J. Donovan; Secretary of the Treasury Donald T. Regan; former Secretary of the Treasury W. Michael Blumenthal; and Assistant EPA Administrator Rita Lavelle.

**15.** Thus, William Ruckelshaus, Administrator of the Environmental Protection Agency, pledged to recuse himself from cases involving a company in which he had a continuing financial interest. Attorney General William French Smith stated that he would not participate in cases in which a party was represented by his former law firm with respect to a matter "for which [he] had principal or substantial responsibility." Elizabeth H. Dole, Secretary of the Department of Transportation, said that she would recuse herself from matters with a direct effect on her home State of Kansas, and Secretary of Agriculture John R. Block similarly stated he would recuse himself from matters affecting counties in which he formerly owned land. Former Sec-

retary of Health and Human Services Joseph A. Califano indicated that he would recuse himself from matters where his former firm represented a party before HHS on matters involving a party to which that firm gave HHS advice. And two members of the Securities and Exchange Commission (Bevis Longstreth and Barbara A. Thomas) asserted that they would recuse themselves in matters in which their former firms were representing a party.

**16.** A fifth official, Daniel C. Schwartz, Assistant to the Director of the FTC's Bureau of Competition, recused himself, among other things, from participation in any matter involving any of six clients for whom he had done the most work while in private practice. Were Miller required to follow that example, he would have had to recuse himself from the GM defects case. However, although the Office of the present General Counsel has taken a less restrictive view than the equivalent officials in the preceding Administration, neither would have mandated the Schwartz recusal.

**17.** Both sides have focused their attention on these Administrations, in recognition of the fact that the post-Watergate period ethical and legal standards have become stricter than they were prior to that time.

relationship to EIA's client General Motors. Nevertheless, the Court has concluded that Chairman Miller's failure to do so does not call for an order of this Court requiring his recusal based on these precedents, for the following reasons.

First. The known precedents do not invariably point in the same direction. Thus, although one Department of Justice official during the Reagan Administration— Schmults—disqualified himself in these factual circumstances, another—Assistant Attorney General William Baxter [18] —did not.

Second. The precedents all involve Justice Department officials. In an executive agency, another official is always available in case of disqualification or recusal of the agency head to whom full authority may be delegated, just as one judge can be substituted for another in case of disqualification or recusal. That is not so in a regulatory commission. If one member of such a commission is disqualified or recused, he cannot, under the law, be replaced (see 16 C.F.R. § 4.14(c)), and the body may thus be left, as in this case, unable to make an effective decision by virtue of an even split.[19] For that reason, there may remain here, unlike in the judicial area, vestiges of a "duty to sit." [20] Although this factor should not be given decisive weight by any means,[21] it is a consideration which distinguishes this case from the Department of Justice precedents.

Third. As indicated *supra*, here, unlike in most cases, there is no ongoing firm to which Miller might be returning, for EIA is merely a shell. One principal reason for concern where an official participates in a case in which the clients of his former firm have a stake is that, by ruling in a particular way, he might be thought to be enriching that firm, his once and future employer. Since EIA is Miller, and since EIA effectively does not now exist, the problem here is not of the same magnitude as it might be in other circumstances.

## IV

The Court does not endorse [22] —it is not called upon to endorse—Chairman Miller's refusal to recuse himself as being *the* proper ethical decision.[23] Absent an abuse of discretion, the decision with regard to recusal is that of the official who is directly involved. That is entirely appropriate be-

---

18. Baxter participated in the government's antitrust suit against IBM although he had previously done consulting work for that company in a private antitrust action.

19. As related *supra*, in that eventuality the particular motion—whatever it may be—fails for want of a majority.

20. Before 28 U.S.C. § 455 was amended in 1975, a judge was deemed to have a "duty to sit" if a close question about his participation was raised. See *Edwards v. United States*, 334 F.2d 360, 362 n. 2 (5th Cir.1964). See also, *United States v. Will*, 449 U.S. 200, 210–17, 101 S.Ct. 471, 478–82, 66 L.Ed.2d 392 (1980).

21. There are policy considerations pointing in the opposite direction, among them particularly the repute of some of the regulatory commissions for political and other influence. On this basis, commission members might be well advised to adopt a strict recusal policy. It may be noted that, while there are differences between the disqualification standards applicable to regulatory adjudications and rulemaking (see *Association of National Advertisers, Inc. v. FTC*, 627

F.2d 1151, 1154 (D.C.Cir.1979); Strauss, *Disqualification of Decisional Officials in Rulemaking*, 80 Colum.L.Rev. 990 (1980)) these differences do not affect the result in this case.

22. After all, a number of other high officials have come to conclusions quite different from Miller's on facts which are in some respects similar to those involved here, and their decisions could be regarded by some as the more prudent ones. See *Potashnick v. Port City Construction Co., supra*, 609 F.2d at 1112; *American Cyanamid Co. v. FTC*, 363 F.2d 757, 767 (6th Cir.1966).

23. Except in case of a violation of a precise standard or an abuse of discretion, it is not decisive what a particular court might do were it faced with the issue facing Miller or what other officials had done in similar circumstances. A widespread disqualification or recusal practice might, of course, provide guidance with respect to a violation of the "reasonable person" standard. But that point has not been reached on the basis of the relatively few examples cited by plaintiffs which are reasonably close on the facts to those involved here.

cause, however much the law has shifted in recent years toward a more objective standard,[24] there remain, of necessity, elements of subjectivity. Individuals differ in the degree to which they might be influenced by various kinds of economic or social relationships as well as in the degree to which they feel they might be influenced by such contacts. Except to the extent that disqualification is mandated by law or by a delineated ethical standard, these are subtle matters which for that reason are governed, at least initially, by individual subjective considerations. That being so, it is appropriate that discretion should be vested in the first instance in the individual whose recusal is at issue, and that his decision should be overturned by a court only for an abuse of that discretion.[25]

The Court's choice thus is not between an endorsement of the conduct in question, on the one hand, and an order disqualifying Miller retroactively from the GM defects case, on the other. All the Court is called upon to do is to determine whether by refusing to recuse himself, Chairman Miller abused the discretion vested in him. For the reasons discussed above, that question must be answered in the negative. Judgment will accordingly be entered for the defendants.

**24.** See *United States v. Cowden,* 545 F.2d 257, 265 (1st Cir.1976).

**25.** Plaintiffs' reference (Memorandum at 35) to Justice Stewart's famous concurrence in *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964), where he stated with respect to obscenity that "I know it when I see it," underscores this conclusion. The Court would not be justified in vacating the FTC decision in the GS defects case merely because of what it might "see" on the appearance of a conflict differs from that Chairman Miller saw.