C & W FISH COMPANY, INC., et al., Appellants,

v.

William W. FOX, Jr., Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration, et al., Appellees.

No. 90–5309.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1991.

Decided May 7, 1991.

Eldon V.C. Greenberg, with whom Dina R. Lassow, Washington, D.C., was on the brief, for appellants.

Elizabeth Ann Peterson, Atty., Dept. of Justice, with whom John A. Bryson, Washington, D.C., Atty., Dept. of Justice, was on the brief, for federal appellees.

Robert G. Hayes, Washington, D.C., for appellee Costal Conservation Ass'n.

Jonathan A. Glogau, Hollywood, Fla., for appellee Florida Marine Fisheries Com'n.

Before MIKVA, Chief Judge, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

On April 13, 1990, the Department of Commerce (Department), National Oceanic and Atmospheric Administration (NOAA), issued a final rule which, in part, bans the use of drift gillnets in the Atlantic King Mackerel Fishery. *See* 55 Fed.Reg. 14,833 (April 19, 1990). Various individuals involved in the fishing industry challenged the final rule on several grounds, including its allegedly *ultra vires* promulgation. The district court rejected all of the plaintiffs' challenges, granting summary judgment to the defendants. We affirm.

I.

The Magnuson Fishery Conservation and Management Act (Magnuson Act or Act), 16 U.S.C. §§ 1801–82, grants the Department the authority to create national programs for the conservation and management of fishery resources while at the same time it preserves the states' ability to play a key role in the development of those programs. To promote these dual aims—the creation of a cohesive national policy and the protection of state interests—the Magnuson Act provides for the creation of eight Regional Fishery Management Councils (Councils). Each Council is granted authority over a specific geographic region and is composed of members who represent the interests of the states included in that

region. 16 U.S.C. § 1852. Under the Act, a Council can propose a Fishery Management Plan (FMP) that is subject to the final approval of the Department Secretary. 16 U.S.C. §§ 1852(h), 1854(a). In the event the Secretary himself proposes an FMP, the Councils must be given an opportunity to submit comments and recommendations on that FMP. 16 U.S.C. § 1854(c)(1), (c)(2). The Magnuson Act thus balances the states' interest in participating in the formulation and administration of fishery plans and the federal interest in the development of a coordinated national fishery program. See 16 U.S.C. § 1801 (listing the Magnuson Act's policy objectives).

To further promote state interests as well as to foster the development of departmental expertise, the Secretary's authority to approve Council proposals has been delegated to various Department officials. It begins with the Secretary's delegation of his approval authority to the Under Secretary for Oceans and Atmosphere (Under Secretary) pursuant to Department Organization Order (DOO) 10–15, § 3.01. The Under Secretary, in turn, has delegated his authority to the Assistant Administrator for Fisheries (Assistant Administrator).[1] NOAA Circular 78–21. Finally, the Assistant Administrator has delegated his authority to the NMFS Regional Directors (Regional Directors). NOAA Circular 83–37. Although each of the internal orders requires lower-echelon officials to approve Council proposals, none of them totally surrenders the delegator's authority to approve proposals. In other words, the orders require Councils initially to submit their proposed FMPs to the Regional Directors; the proposals then move up the ranks of the Department and are subject to approval by the individual officials in the chain of delegation.[2]

This appeal represents the latest chapter in a long attempt by the South Atlantic Regional Council and the Gulf Regional Council to ban drift gillnet fishing for the coastal migratory pelagics fishery.[3] As the name implies, drift gillnet fishing involves the use of a large, drifting net that snags fish by the gills as they attempt to swim through it. See 50 C.F.R. § 642.2. Beginning in 1987, the two Councils sought an emergency ban on the use of drift gillnets pursuant to section 305(e) of the Magnuson Act, 16 U.S.C. § 1855(e). The Southeast Regional Director (Regional Director), who is responsible for both the South Atlantic and Gulf Regions, refused to issue a ban because no "emergency" was deemed to exist. Joint Appendix (JA) 195. The South Atlantic Council then sought to effect the ban by proposing a regulatory amendment to the FMP regulating the Mackerel Fishery, 50 C.F.R. Part 642. That FMP allows the Regional Director to act as the Secretary's designee in authorizing amendments to the plan on his own in the event a "user" or a "gear" conflict arises.[4] See Amendment 1 to the FMP for Coastal Migratory Pelagic resources, section 12.6.9.1, 50 Fed. Reg. 34,840 (Aug. 28, 1985). The method of amendment the South Atlantic Council attempted is intended to allow user and gear conflicts to be resolved quickly and is to be used only in limited circumstances. See JA 247–48 (Regional Director's explanation of denial). Once again, the Regional Director declined to issue the ban, concluding that there was no evidence of a user or a gear conflict. JA 247.

Spanish mackerel, as well as several other species, such as cero, cobia, little tunny, dolphin and, in the Gulf of Mexico only, blue fish. See 50 C.F.R. § 642.2.

4. User and gear conflicts refer to conflicts among different types of fishermen. In the case of Atlantic mackerel, there are primarily three types of gear that fishermen use—net gears (e.g., drift and run-around gillnets and purse seines), hooks-and-lines and recreational equipment—and three types of users—commercial, recreational and subsistence fishermen.

1. The Under Secretary is also the NOAA Administrator and the Assistant Administrator is also the Director of the National Marine Fisheries Service (NMFS).

2. As we discuss in Part II, the exact nature of the power retained by each of these officials is in dispute.

3. This fishery extends from the Virginia–North Carolina border to the United States–Mexico border. See 50 C.F.R. § 642.1 & Appendix A to Part 642. Coastal migratory pelagics include two species of mackerel, king mackerel and

Having failed in their attempts to ban drift gillnets by these two methods, the South Atlantic and Gulf Councils finally proposed a formal amendment—Amendment 3—to the Mackerel Fishery FMP. Amendment 3 proposed two changes: (i) a ban on purse seine gillnets and run-around gillnets for the Atlantic King Mackerel Fishery (Mackerel Fishery);[5] and (ii) a ban on drift gillnets for the entire coastal migratory pelagics fishery. The Regional Director approved the ban on drift gillnets only for Gulf king and Spanish mackerel and Atlantic Spanish mackerel; he refused to approve the ban on run-around gillnets and purse-seine gillnets and drift gillnets for Atlantic king mackerel. His decision was then approved by the Assistant Administrator, the Under Secretary and, finally, the Secretary. *See* 54 Fed.Reg. 29,561 (July 13, 1989) (final rule).

In January 1990, the Gulf Atlantic and South Councils resubmitted the rejected portions of Amendment 3 with a few minor changes. This time the proposed amendment provided for a conditional ban on purse-seine and run-around gillnets for Atlantic king mackerel: the ban was to take effect only if the species became overfished and the entire commercial allocation could be harvested by fishermen using other authorized gear. The proposed amendment, however, still called for an unconditional ban on drift gillnets. The newly appointed Regional Director approved the qualified ban on purse-seine and run-around gillnets but declined to approve the unqualified ban on the use of drift gillnets in the Mackerel Fishery. The evidence presented to support the new submission, he reasoned, had not changed since the first submission and did not warrant a change in agency policy.[6]

When the Regional Director's decision reached Dr. William Fox, the newly appointed NOAA Assistant Administrator, the rejected portions of the amendment gained new life. Fox—who before his appointment had been a strong advocate of

the drift gillnet ban—inexplicably reported that the Regional Director had "approved" the new Amendment 3 and then, himself, approved the full plan, explaining the appropriateness of the ban. JA 459. The Under Secretary and the Secretary subsequently approved the Councils' proposal, JA 464–65 (approvals), and NOAA implemented appropriate notice and comment rulemaking, 55 Fed.Reg. 5,242 (February 14, 1990) (proposed rule); 55 Fed.Reg. 14,833 (April 19, 1990) (final rule).

The issuance of the drift gillnet ban set the stage for this litigation. Immediately after the final rule was issued, two fish wholesalers and two individual fishermen filed suit against the Secretary of Commerce, Robert Mosbacher, and Assistant Administrator Fox in district court, seeking declaratory and injunctive relief. That court granted the plaintiffs' motion for expedited review based on their allegations that the final rule imperiled their economic survival. After hearing argument on the parties' cross-motions for summary judgment, the district court granted the defendants' motion and dismissed the case with prejudice. 745 F.Supp. 6 (D.D.C.1990). The wholesalers and fishermen now appeal, making four challenges: (i) Assistant Administrator Fox is without authority to approve, disapprove or partially disapprove an FMP; (ii) the final rule is not supported by the record; (iii) the final rule does not comply with the Magnuson Act; (iv) the appellants were denied due process because Assistant Administrator Fox had an unalterably closed mind and should have disqualified himself from participating in the rulemaking.

II.

The appellants argue that the final rule must be invalidated because the Assistant Administrator has no authority to approve a proposal that had been disapproved by a Regional Director. According to them, the Assistant Administrator del-

---

**5.** The Atlantic King Mackerel Fishery extends from the Virginia–North Carolina border to the southern tip of Florida. *See* 50 C.F.R. § 642.29 & Appendix A to Part 642.

**6.** The Regional Director did recommend a *conditional* ban on drift gillnets, barring their use if the species became overfished.

egated to the Regional Director the authority to approve, disapprove or partially disapprove a proposed FMP and failed to retain any portion of that authority. The appellees respond to this argument with three points. First, they claim that the Assistant Administrator's retention of approval authority is essential to his functions and therefore the authority should be necessarily implied. Second, they assert that agency practice allows the Assistant Administrator to pass on the proposals and this practice should control. Finally, they assert that the internal order delegating the Assistant Administrator's authority does in fact reserve to him the challenged authority.

While we disagree with the appellees' contentions that the Assistant Administrator could, in the absence of his retention of the requisite authority, reverse the Regional Director's decision based solely on the "importance" of an effective reservation of power, *see United States v. Nixon*, 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3101–02, 41 L.Ed.2d 1039 (1974); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), and that an agency's practice determines the extent of the agency's authority, *see Nixon and Shaughnessy*, nonetheless we do agree with the appellees that the internal order reserves to the Assistant Administrator the authority to approve or disapprove, in whole or in part, a proposed FMP.

To begin with, the Secretary's delegation of authority to the Under Secretary expressly reserves to the Secretary the authority to "[a]pprove, disapprove, partially disapprove, or issue a fishery management plan or amendment and implementing regulations." DOO 10–15 ¶ 3.01.cc.1.(c). The Under Secretary's delegation to the Assistant Administrator is less clear. The internal order expressly provides that the Under Secretary retains the authority to *"be advised* by the Assistant Administrator before ... any final action is taken to issue a preliminary [FMP] ... or to approve, disapprove, partially disapprove or issue a fishery management plan or amendment" (emphasis added). NOAA 78–21 ¶ 5(c). Sim-

ilarly, the Assistant Administrator's delegation order, NOAA 83–37, provides:

4. *Reservation of Authority* —The Administrator [*i.e.*, Under Secretary] and the Assistant Administrator reserve the authority *to be advised* before final action is taken to approve, disapprove, or partially disapprove, or issue an FMP or amendment. *Under Section 3(d) of NOAA Directives Manual 05–60, the Secretary must be advised* in particular instances (generally where the FMP has proved controversial) before final action is taken. (Emphasis added).

Both the Under Secretary and the Assistant Administrator reserve the same authority "to be advised" before final action is taken to approve, disapprove or partially disapprove or issue an FMP or amendment. Any uncertainty regarding the scope of the power "to be advised" is removed by the express reference in NOAA 83–37 to section 3(d) of NOAA Directives Manual 05–60. Section 3(d) reserves to the Secretary the authority to:

d. in particular instances approve, disapprove, partially disapprove, or issue a fishery management plan or amendment and implementing regulations under sections 304 and 305 of the FCMA, 16 U.S.C. Sections 1854 and 1855, in each instance where the Secretary specifically determines that such action is appropriate.

The power to be advised is not included either explicitly or by implication in section 3(d) and yet NOAA 83–37 recites that "under section 3(d)" the Secretary "must be advised" before final action is taken to approve or disapprove an FMP. In order to give meaning to the reference in NOAA 83–37 to section 3(d) as requiring that the Secretary be advised, we must conclude that the power to be advised includes the power "to approve, disapprove, partially disapprove, or issue" an FMP as section 3(d) provides. While we acknowledge that these two powers are ordinarily distinct, or at least not synonymous, and while we note that NOAA could have used more accurate draftsmanship, nonetheless we are required to interpret the actual language used.

Moreover, this interpretation requires no great linguistic contortions. That the two directives intend to reserve or retain some authority is evidenced by their section headings.[7] A reservation of authority merely advised in the sense of receiving notice not only would, without more, provide a totally ineffectual power but also would not constitute a "reserved" authority because that specific authority was not delegated to the Under Secretary or Assistant Administrator in the first place. In order to give the officials' reserved authority some *effect*, the authority to be advised was intended to and must include the approval/disapproval (in whole or in part) authority.

Viewing NOAA Directive 83–37 in the context of the other two delegation directives, we conclude that the Assistant Administrator's reserved power "to be advised" before final action is taken includes the power to approve, disapprove or partially disapprove a fishery management plan or amendment. That directive's equation of the Assistant Administrator's reserved power with that of the Under Secretary as well as its reference to the Secretary's reservation of authority to approve or disapprove in whole or in part as the "power to be advised" manifest that the Assistant Administrator retains the same authority retained by the Secretary—the authority to approve or disapprove or partially disapprove an FMP or amendment.

### III.

■ The appellants next argue that NOAA's final rule reverses an earlier decision and therefore must include a reasoned explanation for that reversal. According to the appellants, that explanation is missing and as a result the rule must be struck down. They further argue that even if NOAA's reasoning is sound, it is not supported by the evidence in the record. NOAA, on the other hand, claims that new data presented after the drift gillnet ban was rejected amply support the approval of the resubmitted version of Amendment 3.

NOAA gives three reasons for its decision to ban drift gillnet fishing in the Mackerel Fishery: (i) the threat of overfishing; (ii) the possible displacement of traditional hook-and-line fishermen; and (iii) excessive by-catch.[8] 55 Fed.Reg. at 14,834. NOAA considered the first two of these rationales when it originally approved Amendment 3 in part and it heavily discounted both of them. 54 Fed.Reg. at 29,562. In order for these two factors to provide the basis of NOAA's new decision after resubmission, then, the final rule must provide a reasoned explanation for the change. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Despite NOAA's assertions during this litigation, no such explanation is apparent in the final rule. In quite general terms, the rule merely states that "[t]here is also a documented tendency for heavily fished mackerel groups to become overfished" and "NOAA accepts that the effect of using drift gillnets unfairly disadvantages hook-and-line fishermen." 55 Fed. Reg. at 14,835. These assertions contrast with NOAA's earlier findings that "the Atlantic migratory group of king mackerel is not overfished [according to] the best and most recent scientific information available" and that "continued use of net gear would not negatively impact traditional hook-and-line participants." 54 Fed.Reg. at 29,562. In light of NOAA's failure to explain its reassessment of these two factors, we conclude that they do not provide an adequate basis for its decision to ban drift gillnets.[9]

---

7. The Under Secretary's reservation is set forth in a section entitled "Reservation of Authority by the Administrator" and the Assistant Administrator's in a section entitled "Reservation of Authority." The Secretary's reservation is set forth in DOO 10–15 and is repeated in Directives Manual 05–60 at section 3 entitled "Reservation of Authority by the Secretary."

8. "By-catch" refers to the inadvertent capture of unwanted fish. Usually by-catch is returned to the sea or discarded.

9. Regarding the overfishing and adverse impact rationales, we assume NOAA relied on the same factual information in both rulemaking proceedings because it makes no reference to new information in its second decision.

On the other hand, we conclude that NOAA's third rationale—excessive by-catch—does provide an adequate basis for NOAA's change. In its initial review of Amendment 3, NOAA did not discuss this issue. In adopting the resubmitted portions of the amendment, however, NOAA reasoned that "[s]ufficient evidence has been presented indicating that drift nets produce a wasteful bycatch of non-targeted species, most of which are discarded." 55 Fed.Reg. at 14,835. In addition, as NOAA points out, a ban on drift gillnets to alleviate the by-catch problem is consistent with "the newly approved FMP objective to minimize waste and bycatch in the fishery." [10] 55 Fed.Reg. at 14,836. This reasoning suffices to explain NOAA's change in position.

Moreover, there is sufficient evidence in the record to support NOAA's finding that drift gillnets create a significant by-catch problem. For example, one report indicates that by-catch amounted to approximately 33 percent of the overall catch for 1989, JA 411–16, whereas other reports describe in detail the wide variety of species inadvertently snagged by the drift gillnets as well as the frequency of their capture, JA 202–03; 224–28. These reports—combined with NOAA's new policy objective that favors protection of by-catch—provide sufficient evidence to support NOAA's decision to ban drift gillnets because of excessive by-catch.

## IV.

■ The Magnuson Act requires that all FMPs comply with seven statutory standards, each of which articulates a specific and essential policy objective. 16 U.S.C. § 1851(a). The Act also requires that the Secretary, when approving or preparing a plan, ensure that the plan comports with these standards. 16 U.S.C. § 1854(a), (c). The appellants contend that Amendment 3 does not comply with two of these seven standards, Standard 1 and Standard 4. Standard 1 provides:

**10.** The new policy objective declared by NOAA is part of the resubmitted version of Amend-

Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

Standard 4 requires:

Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocations shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

In reviewing Amendment 3, our task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record. 16 U.S.C. § 1855(d) (FMP can be reviewed only under 5 U.S.C. § 706(2)); *see Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir.1987); *Maine v. Kreps*, 563 F.2d 1043, 1050–51 (1st Cir. 1977).

### A.

■ In the final rule, NOAA provides two reasons that the drift gillnet ban satisfies Standard 1. First, NOAA reasons:

[T]his prohibition will not reduce the likelihood that optimum yield of the Atlantic migratory group of king mackerel will be harvested. Attainment of [optimum yield] is not guaranteed even with drift gillnets in the fishery.

55 Fed.Reg. at 14,835. Second, NOAA claims that the "management approach necessitated by the 'overfishing' half of standard 1" takes precedence over "attainment of the current [optimum yield]." *Id.* The appellants, however, argue that Standard 1 requires FMPs to achieve full utilization of fishery resources so long as it is done

ment 3. 55 Fed.Reg. at 14,834.

within acceptable biological limits. In other words, they read Standard 1 to mandate that all FMPs promote the maximum sustainable yield. They maintain that, without the use of drift gillnets, the maximum harvest of Atlantic king mackerel cannot be reached.

We reject the appellants' narrow reading of Standard 1. The Magnuson Act, 16 U.S.C. § 1802(18), defines "optimum yield" as:

[T]he amount of fish—
(A) which will. provide the greatest overall benefit to the Nation, with particular reference to food production and recreational opportunities; and
(B) which is prescribed as such on the basis of the maximum sustainable yield from such fishery, *as modified by any relevant economic, social, or ecological factor* (emphasis added).

Significantly, optimum yield is not defined by the "maximum sustainable yield" but instead by the maximum yield *less* whatever amount need be conserved for economic, social or ecological reasons. Stated differently, an FMP can comply with Standard 1 if there are social, economic or ecological factors that justify the pursuit of a yield less than the maximum sustainable yield. *See* 50 C.F.R. § 602.11(d) (maximum sustainable yield is only a "starting point" for determination of optimum yield); 50 C.F.R. § 602.11(f)(3) (listing various factors relevant to determination of optimum yield).

But we do not accept NOAA's rationale that the reduction in the optimum yield here is justified because of overfishing. We have already determined that its finding that drift gillnets will result in overfishing is not sufficiently supported in the record. On the other hand, we do accept

its rationale that the ban "will not reduce the likelihood that optimum yield ... will be harvested." In the final rule, 55 Fed. Reg. at 14,835, NOAA explains:

[a]vailable landings data, since the drift nets were introduced in 1986, do not show a trend of increased landings that might be attributable to this gear.

This finding is adequately supported by the record. *See* JA 343-45 (report of Mackerel Stock Assessment Panel showing "catches have remained relatively stable since 1981").[11] In sum, we conclude that NOAA's explanation that the ban will not affect the Atlantic king mackerel catch is sufficient to comply with Standard 1.

**B.**

Standard 4 sets forth three requirements that must be met whenever an FMP allocates fishing privileges: (i) the allocation must be fair and equitable; (ii) it must be reasonably calculated to promote conservation; and (iii) it must not allocate an excessive share of privileges to any particular group. *See* 50 C.F.R. § 602.14(c)(3). In the final rule, NOAA reasoned that the ban satisfies Standard 4 because it benefits hook-and-line fishermen and at the same time imposes only a slight burden on drift gillnet fishermen.[12] 55 Fed.Reg. at 14,835.

We conclude that NOAA's explanation is sufficient to sustain its finding that the ban is "fair and equitable" as required by Standard 4. To be fair and equitable, a plan "may impose a hardship on one group" only if the hardship "is outweighed by the total benefits received by another group or groups." 50 C.F.R. § 602.14(c)(3)(i)(B).[13] Regarding any hardship imposed by the plan, NOAA points out that the drift gillnet

**11.** Interestingly, the appellants rely on this report to support their contention that the use of drift gillnets poses no threat of overfishing.

**12.** Before this court, NOAA argues that Standard 4 applies only when there is an allocation of privileges among user groups as defined by their "use" of the resource (*i.e.*, commercial, recreational or subsistence), not by their gear. Thus NOAA contends that Standard 4 is not applicable. We reject this argument, raised here for the first time, to justify NOAA's earlier decision. *See Bowen v. Georgetown University*

*Hospital,* 488 U.S. 204, 212–213, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988).

**13.** NOAA's guidelines, which interpret Standard 4, also provide that fairness and equity require a rational connection between a plan's allocation of fishing privileges and the "achievement of [optimum yield] or a legitimate FMP objective." 50 C.F.R. § 602.14(c)(3)(i)(A). Because we have already determined that the plan furthers a legitimate objective—the reduction of by-catch— we need not repeat that inquiry.

fishermen will not be eliminated from the market because they will be able to re-rig their vessels for run-around gillnets and, perhaps, hook-and-line fishing. 55 Fed. Reg. at 14,835. This contention is borne out by the record. *See, e.g.,* JA 69–70 (run-around gill netting will offset some loss of income). As to the plan's expected benefits, NOAA claims that both hook-and-line fishermen and recreational fishermen will be able to increase their productivity. This is so, explains NOAA, because the ban will end the disruption to migration patterns caused by the drift gillnets and will increase the available catch. These findings, too, are amply supported by the record. *See, e.g.,* JA 65–68 (hook-and-line fishermen); 65–66 (recreational fishermen).

The second requirement of Standard 4—promotion of conservation—is not directly addressed by NOAA in the final rule. NOAA's guidelines provide that "[a]n allocation scheme may promote conservation by encouraging a rational, more easily managed use of the resource." 50 C.F.R. § 602.14(c)(3)(ii). This requirement poses only a minimal hurdle for NOAA. As we have already discussed, NOAA had before it sufficient evidence to support its conclusion that the ban will prevent excessive by-catch and, accordingly, is reasonably calculated to promote conservation. The fact that NOAA did not repeat this analysis in its Standard 4 inquiry does not render that inquiry inadequate. We hold that NOAA's determination that the rule comports with Standard 4 is neither arbitrary nor capricious.[14]

## V.

 Finally the appellants contend that Assistant Administrator Fox had an "unalterably closed mind" when he passed on the drift gillnet ban and, consequently, their due process right to an impartial decisionmaker was denied them. To support this claim, the appellants point to the fact that, immediately before his appointment, Fox was the chairman of the Florida Marine Fisheries Commission, an outspoken advocate of the drift gillnet ban. They also point to an article published after Fox was appointed, quoting Fox as stating "[t]here's just no question that this kind of gear [*i.e.,* drift gillnets] should be eliminated.... The drift nets run counter to everything we're trying to do for the fisheries.'" Wickstrom, "The Fox Goes to Washington," *Florida Sportsman* (Oct. 1989), JA 426. Last, the appellants claim that Fox's bias is demonstrated by his failure to conduct an adequate review of the issues or to consider the positions of his staff advisors.

First we reject the suggestion that we look to the adequacy of Fox's examination of the facts and issues in order to determine whether he was biased. In *Association of National Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1170 (D.C.Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980), we held that an individual should be disqualified from rulemaking "only when there has been a clear and convincing showing that the Department member has an unalterably closed mind on matters critical to the disposition of the proceeding." *See also Lead Industries Asso. v. EPA,* 647 F.2d 1130, 1179–80 (D.C. Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). This showing should focus on the agency member's prejudgment, if any, rather than a failure to weigh the issues fairly.[15] Whether Fox

**14.** The appellants do not argue that the final rule violates the third requirement of Standard 4—avoidance of excessive shares—and therefore we do not address that issue.

**15.** In the context of adjudicatory proceedings, where due process requires a more thorough scrutiny of prejudgment bias and prejudice, *see Association of National Advertisers,* 627 F.2d at 1168–69, we have declined to look to the adjudicator's decision in order to infer bias. *See Jenkins v. Sterlacci,* 849 F.2d 627, 634 n. 7 (D.C.Cir. 1988) ("As a means of establishing actual bias, a court's efforts to relate a master's findings to extra-judicial actions that are sufficient to raise a substantial question about disqualification on the basis of appearances, but are insufficient in themselves to establish actual bias, would ultimately require a judgment too refined and much too calibrated in its distinctions to be practical. Such an undertaking would inevitably become an exercise in judicial speculation."). *See also Migliorini v. Director OWCP,* 898 F.2d 1292, 1294 n. 9 (7th Cir.1990) ("to succeed on the issue of ALJ prejudice, [petition-

weighed the facts properly is to be examined only in determining if his decision was arbitrary or capricious. As we have often explained, this court will not second guess an agency decision or question whether the decision made was the best one. *See, e.g., National Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988) (citing *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

The facts in this case do not even approach a "clear and convincing showing" that Fox had an "unalterably closed mind." As we reasoned in *Association of National Advertisers,* "[t]he mere discussion of policy or advocacy on a legal question ... is not sufficient to disqualify an administrator." 627 F.2d at 1171 (footnote omitted). The harm that would result were courts to disqualify agency members whenever they express views in public, as Fox did here, is readily apparent:

> We would eviscerate the proper evolution of policymaking were we to disqualify every administrator who has opinions on the correct course of his agency's future actions. Administrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding. The factual basis for a rulemaking is so closely intertwined with policy judgments that we would obliterate rulemaking were we to equate a statement on an issue of legislative fact with unconstitutional prejudgment.

> \* \* \* \* \* \*

> An administrator's presence within an agency reflects the political judgment of the President and the Senate.... A Commission's view of what is best in the public interest may change from time to time. Commissions themselves change,

underlying philosophies differ, and experience often dictates changes.

*Association of National Advertisers,* 627 F.2d at 1174 (quotations omitted). We conclude that neither Fox's earlier advocacy nor his policy view as publicly expressed demonstrates an unalterably closed mind that would disqualify him as an impartial decisionmaker.

For the foregoing reasons, the district court's decision is

*Affirmed.*

er] would have had to point to something outside the record indicating prejudgment or to have demonstrated that the ALJ's factual findings were undermined by his animus toward the miner."); *Center for Auto Safety v. FTC,* 586 F.Supp. 1245, 1248 (D.D.C.1984) ("public policy dictates great caution regarding the attribution of weight for disqualification or recusal pur-

poses to the final outcome of a case. Reliance upon such considerations is to invite challenges to officials based not upon true conflicts of interest but upon ... the result that would be brought about by the removal of a particular official from the consideration of a particular controversy.").