# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 19, 2011     Decided December 16, 2011

No. 10-5253

AIR TRANSPORT ASSOCIATION OF AMERICA, INC.,
APPELLANT

v.

NATIONAL MEDIATION BOARD, ET AL.,
APPELLEES

———

Consolidated with 10-5254, 10-5255

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-00804)

———

*Robert A. Siegel* argued the cause for appellants. With him on the briefs were *Walter Dellinger*, *Micah W.J. Smith*, *John J. Gallagher*, *Neal D. Mollen*, *Igor V. Timofeyev*, *Mitchell A. Mosvick*, *Robin S. Conrad*, and *Glenn M. Taubman*. *Stephen D. Brody* entered an appearance.

*John S. Koppel*, Attorney, U.S. Department of Justice, argued the cause for appellee National Mediation Board. With him on the brief were *Tony West*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *William Kanter*, Attorney.

*Roland P. Wilder Jr.*, *William R. Wilder*, *Nicholas Paul Granath*, and *Lucas K. Middlebrook* were on the brief for appellees International Brotherhood of Teamsters, et al. *James R. Klimaski* entered an appearance.

*Carmen R. Parcelli* and *Jeffrey A. Bartos* were on the brief for *amicus curiae* Transportation Trades Department, AFL-CIO in support of appellees.

Before: HENDERSON, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: The Railway Labor Act provides that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class." 45 U.S.C. § 152, Fourth. For seventy-five years, the National Mediation Board counted non-voters as voting against union representation, thereby requiring a majority of eligible voters to affirmatively vote for representation before a union could be certified. In 2010, the Board issued a new rule: elections will henceforth be decided by a majority of votes cast, and those not voting will be understood as acquiescing to the outcome of the election. Appellants challenge the new rule, claiming that it violates the statute and is arbitrary and capricious. Rejecting these

arguments, the district court granted summary judgment to the Board. For the reasons set forth in this opinion, we agree and affirm.

## I.

Labor relations in the railroad and airline industries are governed by the Railway Labor Act. *See* 45 U.S.C. § 151 et seq. Passed in 1926 and amended several times since, the Act seeks to avoid strikes by encouraging bargaining, arbitration, and mediation. Its goal is to "avoid any interruption to commerce," 45 U.S.C. § 151a, while protecting the right of workers to "organize and bargain collectively through representatives of their own choosing," 45 U.S.C. § 152, Fourth. *See generally* 45 U.S.C. § 151a (describing the "[g]eneral purposes" of the Act).

The Railway Labor Act has little to say about how employees are to choose their representatives. In section 2, Fourth, the Act provides that "[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class." 45 U.S.C. § 152, Fourth. The statute also established the National Mediation Board, 45 U.S.C. § 154, assigning it the task of recognizing and certifying the chosen representative, 45 U.S.C. § 152, Ninth. "In the conduct of any election[,] . . . the Board shall designate who may participate in the election and establish the rules to govern the election[.]" *Id.* If there are "any dispute[s] . . . as to who are the representatives of such employees," the Board must investigate. *Id.*

Until the rulemaking at issue in this case, the only way employees could vote against union representation was by not voting at all. For example, a ballot might present the option of voting for union A, union B, or union C, and those preferring no union representation would simply abstain. Whichever

candidate received a majority of the votes would become the elected representative unless, of course, a majority of voters abstained.

Last year, after issuing a Notice of Proposed Rulemaking, holding an open meeting, and evaluating public comments, the Board, with one member dissenting, changed its approach in several respects. For one thing, ballots will now include a "no union" option so that employees can affirmatively vote against union representation. Moreover, the Board will no longer interpret an abstention as a vote against union representation. Instead, the Board will interpret the intent of non-voters using "the political principle of majority rule with the presumption that those not voting assent to the expressed will of the majority voting." 75 Fed. Reg. 26,062, 26,069 (May 11, 2010) (internal quotation marks omitted). Finally, and setting the stage for this case, the new rule provides that "a majority of valid ballots *cast* will determine the [union] representative." *Id.* at 26,082 (emphasis added).

In proposing the change, the Board observed that the old rule rested not on "legal opinion and precedents, but on what seemed to the [1935] Board best from an administration point of view." 74 Fed. Reg. 56,750, 56,751 (Nov. 3, 2009) (internal quotation marks omitted). And in explaining its rule, the Board noted that in the political context non-voters are assumed to acquiesce in the outcome of elections on the theory that such an assumption better captures what they intend to convey by abstaining. The Board cited evidence that employees may fail to vote for a variety of reasons, including "travel, illness, or apathy," or because they would prefer to register no opinion on the question. 75 Fed. Reg. at 26,073. As to the last point, the Board cited comments, including one submitted by thirty-nine U.S. Senators, that employees should have an opportunity to truly abstain (of course, under the old

rule abstaining meant voting against representation). *Id.* The Board believed that elections conducted under the new rule would, as in the political context, better reflect the true intent of non-participants, thus increasing the overall accuracy of representation determinations. *Id.*

The Air Transport Association of America, Inc. (ATA), an organization comprising major United States airlines, filed a complaint in the U.S. District Court for the District of Columbia alleging that the Board's new rule runs afoul of section 2, Fourth's plain text because it allows a union to be certified when less than a majority of all eligible voters vote. The complaint also challenged the new rule as arbitrary and capricious in violation of the Administrative Procedure Act. And, based largely on a letter sent from the dissenting member of the Board to several U.S. Senators, ATA sought discovery to explore its allegation that the two-member majority "predetermined" the outcome and "act[ed] with an unalterably closed mind." Appellants' Br. 57 (internal quotation marks omitted). The Chamber of Commerce, along with five Delta employees, who made the additional claim that the new rule violates their First Amendment right to free association, intervened as plaintiffs. The International Brotherhood of Teamsters, the Aircraft Mechanics Fraternal Association, and the United States Airline Pilots Association intervened as defendants.

Citing the general rule that discovery is typically "not available in APA cases," the district court denied ATA's request for discovery because it had failed to make the necessary "significant showing . . . that it will find material in the agency's possession indicative of bad faith or an incomplete record." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, No. 10-0804, slip op. at 3 (D.D.C. June 4, 2010). The district court then granted summary judgment to

the Board. It found that "nothing in the statute unambiguously requires that a majority of all eligible voters select the representative of the employees," nor "does it even require that a majority of all eligible employees vote in order for the election to be valid." *Air Transp. Ass'n*, 719 F. Supp. 2d 26, 33 (D.D.C. 2010). Having found the statute ambiguous, the district court then concluded that the Board's reading of the Railway Labor Act was reasonable. *Id.* at 39. ATA and the other plaintiffs now appeal.

## II.

We begin with the key question presented: does section 2, Fourth require that a majority of eligible voters vote, as ATA claims, or does it allow a union to be certified by a majority of votes cast even if a majority of eligible voters do not participate in the election, as the Board's new rule allows?

The Supreme Court came close to answering this question in *Virginian Railway Co. v. System Federation No. 40*, 300 U.S. 515 (1937). There, two unions competed to represent the employees, and although one union won a majority of the votes cast, it failed to receive votes from a majority of all eligible voters. Interpreting the very provision at issue in this case—section 2, Fourth—the Supreme Court held that a union could win even without procuring a majority of all eligible votes; the union needed only a majority of votes cast. The Court reasoned:

> Election laws providing for approval . . . by a specified majority of an electorate have been generally construed as requiring only the consent of the specified majority of those participating in the election. Those who do not participate are presumed to assent to the expressed will of the majority of those voting.

*Virginian Ry.*, 300 U.S. at 560 (internal citations and quotation marks omitted). We say the Court came "close" to answering the question because, in the election at issue, a majority of eligible voters had in fact voted, meaning that contrary to the repeated assertions of our dissenting colleague, the Court had no need to determine whether a majority must participate, or in other words, whether a quorum is required. *See id.* at 559 (noting that "in the case of the carmen and coach cleaners, a majority of the employees eligible to vote did not participate in the election" and that "[t]here has been no appeal from the ruling of the District Court that the designation of the [union] as the representative of the carmen and coach cleaners was invalid"). We therefore turn to the statute's language, asking first "whether Congress has directly spoken to [this] precise question," *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

Insisting that section 2, Fourth resolves the issue in its favor, ATA marshals three main points about the provision's text. First, it points out that "the right to determine who shall be the representative of the craft or class" belongs to the "majority" of a "craft or class"—not to a minority or to those who happen to vote. *See also* Dissenting Op. at 6 (echoing this argument and describing section 2, Fourth as "grant[ing] the majority . . . the *collective* right to determine the representative"). Second, emphasizing that section 2, Fourth grants the majority "*the* right to determine," rather than "*a* right" to determine and citing the dictionary definition of the word "the," ATA argues that the article "the" confirms that the "right to determine" is a singular right that belongs to the majority of the craft or class. Given this, ATA reasons, the Board may not "transfer the Section 2, Fourth right from the majority of the craft or class to a majority of voters." Appellants' Br. 27. Finally, ATA argues that the word

"determine" (in the phrase "the right to determine") contemplates "an authoritative pronouncement—a declaration rather than mere silence or acquiescence." *Id.* at 28. Accordingly, "the majority of a craft or class will not have exercised its right to 'determine' the representative unless it *declares* its preferences—by, for example, authorizing an election or sanctioning an election by participating in it." *Id.* at 30.

All three arguments suffer from a fundamental defect: nothing in section 2, Fourth "clearly and unambiguously" answers the question before us, as it must under *Chevron* step one. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (per curiam). That is, as the district court observed, nothing in the section clearly and unambiguously requires that a majority must participate in order to have a valid election. Congress, moreover, knows how to impose a quorum requirement when it wants to, as it did for the Board itself in this very statute. *See* 45 U.S.C. § 154, First ("Two of the members in office shall constitute a quorum for the transaction of the business of the [National Mediation] Board.").

To be sure, as ATA observes, section 2, Fourth says that the "majority" has "the" right to "determine" who will represent them. Of course, we would never question Webster's definitions of "the" and "determine." But as the Supreme Court stated, "the words of [section 2, Fourth] confer the right of determination upon a majority of those eligible to vote, but is silent as to the manner in which that right shall be exercised." *Virginian Ry.*, 300 U.S. at 560. The Board's rule allows employees to exercise that right through the most traditional of forums—an election. The fact that a majority of eligible voters decides to abstain—i.e., not exercise its right—hardly suggests that the majority was

deprived of its right. This is how voting rights work. Citizens with the right to vote in a presidential election must register, show up to a polling place on the Tuesday after the first Monday in November, wait in line, enter the booth, and pick a candidate in order to exercise their right. Those who fail to do so have not been deprived of their right. Indeed, under the Board's interpretation of the Railway Labor Act, an abstaining majority unhappy with the outcome of a labor election can simply call for a new election and, by exercising its right through actually voting, produce a different result. *See* 75 Fed. Reg. at 26,077 (reiterating that decertification is allowed when fifty percent of the craft or class shows interest).

ATA's argument stretches section 2, Fourth's language beyond its plain meaning. According to ATA, "the majority of a craft or class will not have exercised its right to 'determine' the representative unless it *declares* its preferences—by, for example, authorizing an election or sanctioning an election by participating in it." Appellants' Br. 30. But one does not, in ordinary parlance or any parlance with which we are familiar, declare a preference merely by authorizing an election. Rather, one declares a preference by affirmatively checking the box next to a candidate's name. Consider two hypothetical elections, each with 100 eligible voters:

> Hypothetical A: 49 vote yes. 2 vote no. 49 are indifferent and abstain.

> Hypothetical B: 49 vote yes. The same 2 still oppose, but this time abstain. The other 49 remain indifferent and again abstain. Thus 49 vote yes and 51 abstain.

Under ATA's interpretation, the majority affirmatively "determines" and "declares" yes in hypothetical A, but fails to do so in hypothetical B, even though the same number voted yes. In effect, ATA interprets "determine" to mean "authorize" so that the only way to run an election is to first have a majority authorize it. In ATA's world, the Railway Labor Act actually says: "An election can be authorized only by a majority of the craft or class." Of course, the statute does not say that, much less say it unambiguously.

Having thus concluded that nothing in section 2, Fourth unambiguously resolves the question before us, we turn to the second step of *Chevron* analysis, asking whether the Board's new rule represents a "reasonable" interpretation of the statute. *Chevron*, 467 U.S. at 844. In thinking about this question, one must remember that even the old rule imposed no quorum requirement. The old rule simply assumed that everyone participated in the election, and it did so by treating those who abstained as having affirmatively voted against representation. Thus, the difference between the old rule and the new rule comes down to how the Board interprets a non-vote: as a vote against unions (old rule) or as acquiescence (new rule).

In adopting its new rule, the Board relied on the Supreme Court's analysis in *Virginian Railway*—that "[t]hose who do not participate are presumed to assent to the expressed will of the majority of those voting" 300 U.S. at 560 (internal quotation marks omitted)—and we see nothing unreasonable about extending that logic to elections where less than a majority of all eligible voters participate. Indeed, political elections are often premised on just that reasoning. *Id.* (citing *Cass Cnty. v. Johnston*, 95 U.S. 360 (1877)). Accordingly, even though less than fifty percent of voters turned out in the 1824, 1920, 1924, and 1996 presidential elections, the nation

still accepted John Quincy Adams, Warren G. Harding, Calvin Coolidge, and William Jefferson Clinton as legitimately elected presidents.

ATA and the dissent emphasize another line from *Virginian Railway*: "If, in addition to participation by a majority of a craft, a vote of the majority of those eligible is necessary for a choice, an indifferent minority could prevent the resolution of a contest." *Id.* at 560; *see also* Dissenting Op. at 4. But the Court was not suggesting that a majority of the craft must participate. It was simply buttressing the point it just made—that it makes no sense to require a candidate to win a majority of all eligible votes. Imagine an election where there are 100 eligible voters, 49 vote yes, 2 vote no, and the remaining 49 are indifferent and abstain. The Court was merely suggesting that it would be absurd to allow the indifferent 49 to "prevent the resolution" of this contest. The Board likewise reasonably decided that the same problem follows from a majority requirement. In our hypothetical, for instance, imagine that the 2 no voters abstain rather than vote, reducing the total number of votes cast to 49. In that situation, a majority requirement would allow the indifferent 49, joined by the 2 no voters, to "prevent the resolution" of the contest.

Indeed, citing *Virginian Railway*, we have held that the National Labor Relations Board, interpreting similar language in the National Labor Relations Act (NLRA), may certify a union even in elections where fewer than a majority of voters participate. *See NLRB v. Cent. Dispensary & Emergency Hosp.*, 145 F.2d 852, 853 (D.C. Cir. 1944) (approving NLRB's certification of election results despite the fact that "the election . . . was carried by a majority of a minority" because the "question seems . . . to be settled by the *Virginia Railway* case"); *see also NLRB v. Standard Lime & Stone Co.*, 149 F.2d 435, 437 (4th Cir. 1945) ("The company seeks to

distinguish the *Virginian Railway* case . . . on the ground that a majority of the employees participated in the elections there; but nothing in the statute furnishes the basis for such distinction."); *Int'l Bhd. of Teamsters v. Bhd. of Ry., Airline & S.S. Clerks*, 402 F.2d 196, 204 n.16 (D.C. Cir. 1968) (noting the same); 75 Fed. Reg. at 26,069 (noting that these cases support its reading of *Virginian Railway*). Comparing the two statutes, we see no relevant textual difference. *Compare* 45 U.S.C. § 152, Fourth ("The majority of any craft or class of employees shall have the right to determine[.]"), *with* 29 U.S.C. § 159(a) ("Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining[.]"). ATA nonetheless argues that the NLRA "merely provides that *if* the majority has 'selected or designated' a union as its representative, *then* that union will represent the entire unit." Appellants' Br. 33. True enough, but under both statutes a union will represent employees *if* and *only if* a majority selects the union. To be sure, we must avoid placing too much weight on the NLRA. *See Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 439 (1989). But the "majority" rules under both the NLRA and the Railway Labor Act, and we have held that the NLRA imposes no quorum requirement.

ATA and the dissent also argue that because the NLRA affords greater judicial review than the Railway Labor Act, the Board's new rule—without "the safeguard provided by judicial review available under the NLRA"—can lead to the certification of "minority-supported" unions, which in turn will produce labor instability. Dissenting Op. at 10. But the Board carefully considered this question and concluded that its new rule would have little effect on labor stability, a judgment to which we owe great deference. *See infra* at 15.

**III.**

ATA offers four independent reasons for why it thinks the new rule is arbitrary and capricious: (1) the rule is unsupported by "compelling reasons," as, according to ATA, the Board's precedent requires, or, for that matter, by the reasoned decisionmaking called for by the APA; (2) although the Board had justified its old rule on the premise that it promoted "labor stability," it now arbitrarily disregards that rationale; (3) the Board's new rule is inconsistent with its treatment of its decertification and run-off procedures; and (4) the Board failed to conduct the evidentiary hearing ATA argues Board precedent requires.

As to its first point, ATA contends that the Board failed to satisfy its long-standing "compelling reasons" standard for changing rules, "under which . . . a proposed rule change [must either be] mandated by the [Railway Labor Act] or essential to the Board's administration of representation matters." Appellants' Br. 40 (internal quotation marks omitted). ATA notes that the Board considered changing its voting rule in 1948, 1987, and again in 2008, and on all three occasions was unpersuaded that it needed to change its rules to make elections more accurate, i.e., more reflective of non-voter intent. *See Pan Am. Airways, Inc.*, 1 N.M.B. 454, 455 (1948); *Chamber of Commerce*, 14 N.M.B. 347, 360 (1987); *Delta Air Lines, Inc.*, 35 N.M.B. 129, 132 (2008). According to ATA, the Board neither explained why it now disagrees with these prior conclusions nor identified any new circumstances that might account for its change of heart. In the alternative, ATA argues that the Board's accuracy theory finds no support in "rational and neutral principles." Appellants' Br. 40 (internal quotation marks omitted). We disagree.

As an initial matter, the Board has never adopted a "compelling reasons" standard. True, in *Chamber of Commerce*, in which the Board considered and rejected the very rule it has now adopted—i.e., allowing elections to be decided by a majority of votes cast—it did state that the union had "not provided the Board with compelling reasons to change practices in effect for over fifty years." *Chamber of Commerce*, 14 N.M.B. at 362. This, however, is a feeble basis on which to declare the Board has a formal, established practice of requiring "compelling reasons." In any event, here the Board did find "compelling reasons to make this change to the representation election procedure at this time." 75 Fed. Reg. at 26,072. As the district court put it, "[t]hroughout the Final Rule the Board provides evidence and analysis for why the New Rule will better determine employees' preference regarding representation." *Air Transp. Ass'n.*, 719 F. Supp. 2d. at 44. The Board determined that its new rule, which assumes that non-voters intend to acquiesce rather than to affirmatively vote against representation, better captures a non-voter's "true intent" and thus "allow[s] the Board to more accurately determine the employees' true choice." 75 Fed. Reg. at 26,073. Given the Board's statutory responsibility for administering representation elections, we do not see how it could be arbitrary and capricious for the Board to believe that persuasive arguments for how to more accurately measure the results of such elections are "compelling."

ATA makes much of the fact that the old rule was in place since 1935 and that the Board declined at least three opportunities to change the rule. But the Supreme Court has held that the APA allows an agency to adopt an interpretation of its governing statute that differs from a previous interpretation and that such a change is subject to no heightened judicial scrutiny. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) ("We find no

basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review. The Act mentions no such heightened standard. And our opinion in *State Farm* neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance."). Thus, for purposes of APA review, the fact that the new rule reflects a change in policy matters not at all. We uphold the new rule because, for the reasons explained above, the Board "articulated a rational connection between the facts found and the choice made," *City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (internal quotation marks omitted).

As to ATA's second argument, it is true that the Board justified its old rule in part on grounds of labor stability. *See* 75 Fed. Reg. at 26,076. But as noted above, an agency remains free to change its views where its action rests on reasoned decisionmaking. In its new rule, the Board devoted two full pages to the issue, *see id.* at 26,076–79, observing that in its experience, election procedures have had little effect on labor stability; rather, labor stability "in the industries has been attributed over the years to the Act's mediation process, the existence of collective bargaining agreements, and the restriction on carrier interference in representation matters." 75 Fed. Reg. at 26,077. The Board also noted that its prior statements about the relationship between voting procedures and stability were based on reasoning from first principles, not empirical evidence, and that it no longer finds such reasoning persuasive. *Id.* at 26,078 (noting the lack of evidence). ATA's argument—that the old rule's majority quorum requirement contributed to labor stability—is certainly plausible. But under the APA, the question for us is whether the Board considered all the facts before it, whether it drew reasonable inferences from those

facts, and whether its final decision was rationally related to those facts and inferences. Nothing in either the record or ATA's briefs suggests that the Board failed in this task.

Moving on to ATA's third argument—that the new rule conflicts with the Board's decertification and run-off procedures—we begin by pointing out that the Board has no formal decertification process. To decertify a union, employees designate a straw man to run against the union representative with the understanding that, if elected, the straw man would disclaim any representative status. To trigger such an election, over fifty percent of represented employees must show interest. *See* 29 C.F.R. § 1206.2(a) ("[A] showing of proved authorizations (checked and verified as to date, signature, and employment status) from at least a majority of the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees[.]"). By contrast, a regular election can be initiated by the vote of thirty-five percent of unrepresented employees. This has always been the rule. The difference between the old rule (favored by ATA) and the new rule (challenged by ATA) is how non-votes are interpreted once an election is called. Under the new rule, once an election is initiated—again, by a thirty-five percent showing of interest—a union can be certified by winning a majority of the votes cast. But under the old rule, once an election was initiated, a union could not be certified if a majority of employees abstained (because those non-votes were counted as votes against certification). Thus, even though thirty-five percent of the employees can initiate an election under both rules, a union could be certified under the old rule only if a majority of employees voted in favor of representation. Because the new rule no longer requires such a majority in order to certify a union representative, ATA argues that the Board acted arbitrarily

and capriciously by continuing to require a fifty percent showing of interest for a decertification election—the problem being that it is now harder to decertify than to certify. *See also* Dissenting Op. at 12.

To reiterate, the Railway Labor Act spells out no procedures for either representation or decertification and, for that matter, makes no mention of decertification procedures, much less requires them. Absent plain statutory language or some other evidence of congressional intent to guide us one way or the other, we defer to the Board's reasonable balance of the competing interests at stake. *See Am. Mar. Ass'n v. United States*, 766 F.2d 545, 560 (D.C. Cir. 1985) ("[Courts] accord substantial deference to an interpretation of a statute" when that interpretation "represents a reasonable accommodation of the conflicting policies that were committed to the agency's care by the statute," (internal quotation marks omitted)). The Board determined that decertification elections, if easy to call, would encourage union raiding—i.e., if decertifying a union is easy, unions will constantly call for decertification elections to oust the incumbent. 75 Fed. Reg. at 26,077–78. Indeed, several commenters expressed exactly this concern. *Id.* In response, the Board observed that "it is not changing its showing of interest requirements" and thus "it is unlikely that there will be a great increase in 'raiding' among unions." *Id.* at 26,077. Perhaps much can be said both for and against the way the Board has set up decertification elections, but given its rational consideration of stability, the least that can be said for its new rule is that it survives arbitrary and capricious review.

As to the related question—the Board's run-off procedures—decertification ballots under the old rule presented three choices: the incumbent union, the straw man, and a write-in option. Under the new rule, the decertification

ballot will also contain a "no union" option. ATA complains that the Board "acknowledges that the straw-man serves solely as the proxy for a 'no union' vote, yet it nevertheless retains this completely redundant option." Appellants' Br. 52 (citation omitted).

To see how the rule operates and why ATA objects, consider a hypothetical: 100 eligible voters, 25 vote for union A, 26 vote for the straw man, 30 vote for no union, and the remaining 19 abstain. In that situation, because no one option received a majority of the 81 votes cast, the Board's rules would require a run-off election. But the run-off would be between union A and the straw man, leaving out the "no union" option even though that option received a plurality of the votes. This is because (1) to win the election, a candidate needs a majority of the votes cast, (2) if no one candidate gets a majority, the election goes to a runoff between the two candidates with the most votes, and (3) if no single anti-union option (the straw man or the actual "no union" option) receives a majority in the first round, the Board will treat votes cast for the straw man as votes for representation and then aggregate them with those cast for the union. In our hypothetical, the Board will treat the election as having produced 51 votes for some sort of representation (25+26), and call a runoff between union A and the straw man. Thus, the "no union" option can never be in the runoff; it either wins a majority of votes the first time or it is eliminated. The Board's reason for doing this rests on an assumption that given the availability of a "no union" option, those voting for the straw man are in fact voting for "some sort of representation" that will presumably be different from the no union vote.

This quarrel is inconsequential. In the runoff, all "no union" voters should simply vote for the straw man; doing so

will defeat union representation and produce the same result. This may not be the best system, but potential redundancy is insufficient to make it arbitrary and capricious. *Cf. Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) (under the arbitrary and capricious standard of review, an agency "is not required to choose the best solution, only a reasonable one").

This brings us to ATA's fourth argument—that the Board acted arbitrarily and capriciously by failing to conduct the "robust evidentiary hearing required by its own precedent." Appellants' Br. 54. According to ATA, the Board "made a firm commitment that it would change its standards for union elections only after engaging in a complete and open administrative process including a full evidentiary hearing with witnesses subject to cross-examination." *Id.* (internal quotation marks omitted). To support this proposition, ATA cites *Delta Air Lines*, 35 N.M.B. at 132, and *Chamber of Commerce*, 14 N.M.B. at 360–62 and 13 N.M.B. 90, 94 (1986). But we agree with the Board that neither case makes this commitment.

In *Chamber of Commerce*, the Board held an evidentiary hearing in response to a petition requesting a rulemaking proceeding because such a hearing was "the most appropriate method of gathering the information and evidence" necessary to decide whether to initiate rulemaking. *Chamber of Commerce*, 13 N.M.B. at 94. In other words, the Board was considering a pre-rulemaking petition and concluded that an evidentiary hearing was necessary and appropriate. As the district court noted, "the Board never suggested that a full evidentiary hearing would be appropriate in proposing a rule or engaging in formal or informal rulemaking under the APA." *Air Transp. Ass'n*, 719 F. Supp. 2d at 43. Thus, we see no reason why *Chamber of Commerce* would apply here,

much less why it would bind the Board. And in *Delta Air Lines*, the Board did nothing more than suggest that "a complete and open administrative process" was necessary to change its voting rules. 35 N.M.B. at 132. As the Board points out, suggesting that notice-and-comment rulemaking under the APA constitutes "a complete and open administrative process" can hardly be arbitrary and capricious. And in any event, an agency may change its procedures so long as the new interpretation "is otherwise legally permissible and is adequately explained." *Chem. Waste Mgmt., Inc. v. EPA*, 873 F.2d 1477, 1481 (D.C. Cir. 1989); *see also Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967). Here, notice-and-comment rulemaking, which allowed for public participation and enabled the Board to gather relevant information, is more than enough to pass muster under the APA.

## IV.

We turn to ATA's final argument: that the district court abused its discretion by denying discovery into whether the Board majority "predetermined" the outcome and "act[ed] with an unalterably closed mind." Appellants' Br. 57. ATA argues that the district court erred in doing so because (1) it applied the wrong legal standard, a claim we review de novo, *see FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001), and (2) the publicly available facts adequately support its request for discovery, a claim we review for abuse of discretion, *see In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1211 (D.C. Cir. 2004).

Decisionmakers violate the Due Process Clause and must be disqualified when they act with an "unalterably closed mind" and are "unwilling or unable" to rationally consider arguments. *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1170, 1174 (D.C. Cir. 1979). "[A]n individual should

be disqualified from rulemaking only when there has been a clear and convincing showing that the . . . member has an unalterably closed mind on matters critical to the disposition of the proceeding." *C&W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1564 (D.C. Cir. 1991) (internal quotation marks omitted).

ATA's concern rests primarily on a letter from dissenting Chairman Dougherty to several U.S. Senators reporting that "[t]he proposal was completed without my input or participation." Letter from Elizabeth Dougherty, Chairman, National Mediation Board, to Nine U.S. Senators 1 (Nov. 2, 2009). Dougherty wrote that Members Hoglander and Puchala informed her not only "that they had prepared a 'final' version of the proposed rule and intended to send it to the Federal Register" that very day, but also that she had only ninety minutes to consider the proposed rule and "would not be permitted to publish a dissent in the Federal Register." *Id.* at 1–2. When she protested, they gave her an additional twenty-four hours, as well as an opportunity to dissent. But when she submitted her dissent, they required her to remove any "discussion of . . . process flaws." *Id.* at 2. Although "preferr[ing] not to discuss Board process so publicly," Chairman Dougherty expressed her deep concerns about this "sort of exclusionary behavior," which, to her, "g[ave] the impression that the Board has prejudged this issue." *Id.* at 2.

In support of its charge against Members Hoglander and Puchala, ATA argues that "the publicly-available evidence supports the inference that the . . . majority engaged in a coordinated effort with two large unions to ensure that important representation elections at Delta would be processed under a new voting rule." Appellants' Br. 59–60. In particular, ATA accuses the Board of delaying Delta's elections until it issued the NPRM, noting that on the very day

the Board published the NPRM, the unions withdrew their election applications because they preferred to have their elections governed by the new rule.

According to ATA, the district court applied the wrong standard in denying its motion for discovery. ATA reads the district court's opinion as demanding evidence that " 'ineluctably require[s] the inference that the majority Board members were acting with closed minds, in bad faith, or in collusion with outsiders regarding issuance of the New Rule.' " Appellants' Br. 57 (quoting *Air Transp. Ass'n*, No. 10-0804, slip op. at 6). But as the Board observes, ATA cherry-picks from the district court's analysis. From the very outset, the district court clearly announced the correct legal standard: "Discovery typically is not available in APA cases. But if a party makes a significant showing—variously described as a strong, substantial, or prima facie showing— that it will find material in the agency's possession indicative of bad faith or an incomplete record, it should be granted limited discovery." *Air Transp. Ass'n*, No. 10-0804, slip op. at 3; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[T]here must be a strong showing of bad faith or improper behavior before [an inquiry into the administrative decisionmaking process] may be made.").

The district court then carefully reviewed all of the facts and determined that ATA had failed to make the required showing—a conclusion that easily satisfies our deferential standard of review. To be sure, Chairman Dougherty's letter reflects serious intra-agency discord, and Members Hoglander and Puchala's treatment of their colleague fell well short of ideal. But as the district court found, the letter—written by a dissenting member and saying only that the Board's behavior gave "the impression" of prejudgment—falls short of the "strong" evidence of "unalterably closed minds" necessary to

justify discovery into the Board's decisionmaking process. *Cf. Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (noting, in the FOIA context, "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news"). This is so even though Members Hoglander and Puchala may well have had their own views about how union elections should be run. *See C&W Fish Co.*, 931 F.2d at 1565 ("We would eviscerate the proper evolution of policymaking were we to disqualify every administrator who has opinions on the correct course of his agency's future actions. Administrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding."). Indeed, even where a commission member had inappropriately announced "a prediction of [agency] action and (implicitly) [announced his] own considered position," we concluded that the Due Process Clause was not offended because "that impropriety . . . gives no indication of a mind that has been closed to the evidence in the past or that would disregard any significant new material subsequently introduced." *Consumer Union of U.S., Inc. v. FTC*, 801 F.2d 417, 427 (D.C. Cir. 1986). Finally, the district court found that the delays in conducting Delta's elections could be explained by legitimate reasons. *Air Transp. Ass'n*, No. 10-0804, slip op. at 8–10. One union's application to represent Delta fleet employees "was delayed because Delta challenged the appropriateness of the group [that union] proposed to represent." *Id.* at 8. That challenge "required further briefing which slowed the process." *Id.* at 9. According to the district court, the other union's application was delayed because the Board had been asked to review an issue antecedent to the running of the election. *Id.* "Given the presumption that agency members act in good faith, and the lack of concrete evidence to the contrary," the district court concluded that it would "not discredit the Board's stated reasons for the delay

[in these elections]." *Id.* ATA has given us no reason to think that any of the district court's conclusions amounted to an abuse of discretion.

## V.

Finally, the five individual appellants argue that the new rule violates their First Amendment rights to free association. As the Second Circuit explained when faced with the same argument: "Not surprisingly, there is little support for such a proposition. The First Amendment right of free association has never been held to mandate 'majority rule' in the labor relations sphere." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1251–52 (2d Cir. 1992).

## VI.

For the foregoing reasons, we affirm.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

Seventeen years ago, this Court had to rein in the National Mediation Board (NMB or Board) for "blatantly [] exceed[ing] its statutory authority" and, in doing so, it minced no words. *See Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 664 (D.C. Cir. 1994). Writing for the *en banc* Court, Judge Edwards vacated a Board procedure authorizing both carriers and the Board *sua sponte* to trigger Board investigations of representation disputes under section 2, Ninth of the Railway Labor Act (Act), 45 U.S.C. § 152, Ninth. *Id.* For the previous sixty years, the Board had initiated such investigations only on petition of, or on behalf of, employees, as section 2, Ninth commands. The Court assailed the Board's "gross violation" of section 2, Ninth, concluding that the procedure was "not only unprecedented, but legally insupportable as well." *Id.* at 659, 664.[1] It looks to me as though the Board is at it again, only this time my colleagues are letting them get away with it. Accordingly, I respectfully dissent.

Section 2, Fourth provides: "The majority of any craft or class of employees shall have the right to determine who shall

---

[1] The vacated panel opinion, written by then-Judge Ruth Bader Ginsburg, had likewise invalidated the Board's procedure, concluding that it was "without legislative license," *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 988 F.2d 133, 134 (D.C. Cir. 1993), *vacated*, 996 F.2d 1271 (D.C. Cir. 1994) (*en banc*), and reminding the Board that it "may not serve as surrogate legislator." *Id.* at 141 n.10. The Board plainly needed that reminder, as the panel opinion emphasized by relying on, *inter alia*, *Detroit & T.S.L. R.R. v. United Transp. Union*, 396 U.S. 142, 158–59 (1969). *See id.* In that case, 25 years earlier, the U.S. Supreme Court had declared: "Certainly there is nothing in the [Railway Labor] Act which can be interpreted as giving the Mediation Board the power to change the plain, literal meaning of the statute." *Detroit & T.S.L. R.R.*, 396 U.S. at 159.

be the representative of the craft or class . . . ." 45 U.S.C. § 152, Fourth. Were I writing on a clean slate—that is, without knowing the background of section 2, Fourth's enactment, without reading the Supreme Court's decision in *Virginian Railway v. System Federation No. 40*, 300 U.S. 515 (1937), and, most important, without using the *Chevron*[2] invention—I would conclude, as urged by Appellant American Transport Association of America, Inc. (ATA), that section 2, Fourth means the majority of the relevant craft/class must vote for, or otherwise endorse, unionization. While the overlay created by the provision's background, by the Supreme Court's reading of it and even by the *Chevron* sequence has complicated otherwise straightforward language, what it has *not* done is to replace "majority"[3] participation with a lesser number.

The 1934 amendment of the Railway Labor Act, of which section 2, Fourth is a part, is discussed in *Virginian Railway*. The case involved a representation dispute pitting the "company union,"[4] the Mechanical Department Association of the Virginian Railway (Association), against System Federation No. 40, a local of the American Federation of Labor (Federation). The Board subsequently certified the Federation as the "duly accredited representative of petitioner's employees in the six shop crafts," including all mechanical department employees except for the carmen and

---

[2] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

[3] "Majority" means "a number greater than half of a total." Webster's Third New Int'l Dictionary 1363 (1993).

[4] A "company union" was organized and controlled by the railroad to, *inter alia*, counter efforts by employees to organize rival unions. Representation Election Procedure, 75 Fed. Reg. 26,062, 26,074 (May 11, 2010).

coach cleaners.[5]  *Virginian Ry.*, 300 U.S. at 539. Notwithstanding the Board's certification, the railroad refused to recognize the Federation, even organizing another company union. *Id.* at 539–40 & n.1.  The railroad made several challenges, including one to the certification of the Federation as the blacksmiths' representative.  The blacksmiths' craft had 46 members eligible to vote and 30—a majority of the craft— had participated in the election.  Because the Federation had not received a majority of the votes of the entire craft (23 plus 1 or more) but instead only 22 votes (the other 8 voting for the company union), the railroad maintained the Board's certification of the Federation was invalid. *See Sys. Fed'n No. 40 v. Virginian Ry. Co.*, 11 F. Supp. 621, 626 n.1 (E.D. Va. 1935).

The Supreme Court upheld the certification of the Federation, however, and, in so doing, interpreted section 2, Fourth—an interpretation that has endured ever since. Rejecting the railroad's reading, the Court noted that section 2, Fourth "confer[s] the right of determination upon a majority of those eligible to vote, but is silent as to the manner in which that right shall be exercised." *Virginian Ry.*, 300 U.S. at 560. Borrowing from the "general[] constru[ction]" of election laws that require for success a majority vote of the electorate, the Court stated the majority vote of the electorate means "the consent of the specified majority of those participating," while those not participating " 'are presumed to assent to the expressed will of the majority

---

[5] The carmen and coach cleaners were not included in the Board's certification because, as the district court held, a majority of that craft had *not* participated in the election.  *Sys. Fed'n No. 40 v. Virginian Ry. Co.*, 11 F. Supp. 621, 628 (E.D. Va. 1935).  No party appealed from the district court's holding.  *Virginian Ry.*, 300 U.S. at 559.

of those voting.' " *Id*. (quoting *Cnty. of Cass v. Johnston*, 95 U.S. 360, 369 (1877)). The Court's next words bear quoting:

> We see no reason for supposing that section 2, Fourth (45 USCA § 152, subd. 4), was intended to adopt a different rule. If, in addition to participation by a majority of a craft, a vote of the majority of those eligible is necessary for a choice, an indifferent minority could prevent the resolution of a contest, and thwart the purpose of the act, which is dependent for its operation upon the selection of representatives.

*Id*.[6] The Court concluded its discussion by examining the congressional intent manifested in the language used in section 2, Fourth, noting that it was taken from a rule promulgated by the former Railroad Labor Board pursuant to the Transportation Act of 1920, a predecessor of the Act. The Labor Board had construed the language to mean that a majority of the votes cast sufficed to select a representative "where it appeared that *a majority of the craft participated* in the election." *Id*. at 561 (emphasis added).

While *Virginian Railway* addresses many other issues,[7] its resolution of the section 2, Fourth issue makes one critical

---

[6] At the time, employees were not allowed to vote for "no representation." Instead, they could select only between competing unions. The Board instructed employees who wanted no representation to abstain from voting because, at that time (and until it promulgated the challenged rule) it considered non-voting employees as having voted for "no representation." 75 Fed. Reg. at 26,062–63; *see e.g., Sys. Fed'n No. 40*, 11 F. Supp. at 626 n.1 (ballot allowed employees to vote for Federation or Association only). *See infra* note 9.

[7] Indeed, the Court described the railroad's section 2, Fourth challenge as a "minor objection[]." *Virginian Ry.*, 300 U.S. at 541.

point unmistakably clear: the majority of the craft/class *must participate in* any unionization election. That majority participation is a condition precedent is manifested by the fact that the carmen and coach cleaners election in which the majority of the craft did *not* participate was declared invalid and, although the declaration was not appealed, the Court saw fit to note the declaration in its six-paragraph discussion of section 2, Fourth. Moreover, in adopting its majority-of-votes-cast-*with*-majority participation interpretation, the Court expressly described majority participation as "necessary" when it declined to make, "in addition," the majority of those eligible to vote necessary to choose a representative. And its use of the phrase "indifferent *minority*" makes clear that "majority participation" is required; otherwise the "indifferent" (i.e., non-participating) members of the craft/class could have just as easily comprised a majority.

As noted, *Virginian Railway*'s construction of section 2, Fourth has endured for over three-quarters of a century. In 1943, our Circuit applied *Virginian Railway*, construing section 2, Fourth to require for unionization "the majority of the votes cast at an election, *provided a majority of those eligible to vote have participated*." *See Bhd. of Ry. & S.S. Clerks v. United Transp. Serv. Emps. of Am.*, 137 F.2d 817, 819 (D.C. Cir. 1943) (citing *Virginian Ry.*) *rev'd per curiam on jurisdictional ground*, 320 U.S. 715 (1943) (emphasis added); *see also Nashville, C. & St. L. Ry. v. Ry. Emps.' Dept. Labor*, 93 F.2d 340, 343 (6th Cir. 1937) (upholding Board's certification based on majority of votes cast because majority of eligible employees voted) (citing *Virginian Ry.*); *NLRB. v. Whittier Mills Co.*, 111 F.2d 474, 477–78 (5th Cir. 1940) (interpreting *Virginian Railway*'s holding as "[w]here with fair opportunity to all members of the unit to vote, a majority do vote, they are, so to speak, a quorum to settle the matter, and the majority of that quorum binds those not voting, and suffices to select the bargaining representative of the unit");

*see also Ass'n of Clerical Emps. v. Bhd. of Ry. & S.S. Clerks*, 85 F.2d 152, 156 (7th Cir. 1936) (pursuant to section 2, Fourth, if majority of eligible employees participates in election, "the general rule applies that those not voting at an election should be considered as assenting to the will of the majority there expressed") (citing *Cnty. of Cass v. Johnston*, 95 U.S. 360 (1877)). *But see NLRB v. Cent. Dispensary & Emergency Hosp.*, 145 F.2d 852, 853–54 (D.C. Cir. 1944) (in election under National Labor Relations Act, *Virginian Railway* construed to apply majority-of-votes-cast rule); *Int'l Bhd. of Teamsters v. Bhd. of Ry., Airline & S.S. Clerks (BRAC)*, 402 F.2d 196, 204 n.16 (D.C. Cir. 1968) (same).

Having considered the backdrop against which section 2, Fourth was enacted as well as the lone Supreme Court decision construing it, I am convinced, as I would have been had I not considered the background and *Virginian Railway* overlay, that section 2, Fourth unambiguously requires that the majority of the craft/class must participate in any representation election. Section 2, Fourth grants the majority of a craft/class the *collective* right to determine the representative; it does not grant each employee an individual right to vote in an election as is the case with popular elections.[8] While we all agree that every eligible employee is entitled to vote, the issue is who determines the representative: the majority of those who vote for a representative with majority participation or the majority of those who vote for a representative *without* majority participation? Section 2, Fourth declares loud and clear that the majority—which *collectively* possesses the right—necessarily must participate in determining the representative.

---

[8] My colleagues' discussion of presidential elections, Majority Op. at 10–11, thus misses the crucial issue.

The Supreme Court reached the same conclusion in *Virginian Railway*, finding section 2, Fourth "silent" (and therefore unclear) only "as to the manner" in which the majority's right is to be exercised. While the Court included within "manner" whether the majority of the craft/class must also *vote for* a particular union—deciding it did not—it did not find section 2, Fourth "silent" as to majority participation. This being so, I believe section 2, Fourth in pertinent part merits a *Chevron* one analysis, that is, its requirement that the majority of the craft/class participate in determining unionization *vel non* is unmistakably plain.

And so I come to the NMB's challenged rule, which provides in relevant part:

> In representation disputes, a *majority of valid ballots cast* will determine the craft or class representative.

75 Fed. Reg. at 26,062 (emphasis added).[9] Because the rule jettisons majority participation, it violates section 2, Fourth

---

[9] The challenged rule effects a change in the Board's treatment of non-voters. Under the old rule, the Board presumed that non-voters opposed representation. 75 Fed. Reg. at 26,062–63. Under the new rule, the Board presumes that non-voters "acquiesce in the will of the voting majority." *Id.* at 26,078. The Board's *volte face* in this case is reminiscent of its ill-fated Merger Procedures which we struck down as a violation of section 2, Ninth in *Railway Labor Executives' Ass'n*, *supra*. There, we characterized its action as "much more than a midstream change in course; [it is] a wholesale attempt to rewrite the statute and history." 29 F.3d at 669. Just as section 2, Ninth left the Board without authority to adopt the Merger Procedures, *id.* at 664–71, section 2, Fourth does not authorize the Board to presume the acquiescence of non-voters *if* the majority of a craft/class has not participated in a representation election. The Board does not "possess[] *plenary* authority to act within a given area simply because Congress has endowed it with

and, accordingly, I would invalidate it. *U.S. Dep't of State v. Coombs*, 482 F.3d 577, 580 (D.C. Cir. 2007) (striking down agency regulation "as an impermissible interpretation" of statutory language). As *Chevron* itself emphasizes: "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." 467 U.S. at 843 n.9. In interpreting the plain meaning of section 2, Ninth in *Railway Labor Executives' Ass'n, supra*, we left no doubt as to the limited, if any, applicability of deference to an agency's statutory interpretation if "Congress has directly spoken to the precise question at issue" and left "no gap for the agency to fill." *Ry. Labor Execs.' Ass'n*, 29 F.3d at 671 (internal citation omitted)*; see also Natural Res. Def. Council v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993) ("[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*.") (internal quotation omitted). Here, the Congress has spoken to the precise question at issue—who determines the representative of a craft/class—and has left no gap to be filled by a Board rule that impermissibly reads "majority" out of section 2, Fourth.

Assuming without concluding that the Board's challenged rule is a permissible interpretation of section 2, Fourth, it nonetheless fails at *Chevron* step two because the Board has failed to provide a "reasoned explanation" therefor. *See Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011). While under *Chevron* step two the Board is free to reinterpret section 2, Fourth in favor of an alternative, permissible interpretation, it must nonetheless

---

*some* authority to act in that area." *Id*. at 670 (emphases in original).

explain itself.  *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810–11 (2009) (agency must provide "reasoned explanation" for adopting new, permissible interpretation of statute).

The Board relies primarily on judicial interpretations of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151 *et seq.*, to support the challenged rule, Appellee's Br. at 26–29, but the fit is far from neat given the Supreme Court's admonition that "the NLRA cannot be imported wholesale into the railway labor arena.  Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 439 (1989) (internal quotation marks omitted).  Caution is particularly needed here where the statutory schemes provide different mechanisms for ascertaining whether a representative has the support of the majority of the craft/class it seeks to represent.  While section 9(a) of the NLRA uses language similar to section 2, Fourth to apply the majority-of-votes-cast rule in selecting a representative, the NLRA also provides for judicial review of elections conducted thereunder.  29 U.S.C. § 159(a);[10] s*ee Cent. Dispensary & Emergency Hosp.*, 145 F.2d at 854 ("While the standards by which the [NLRB] determines whether a minority election is truly representative are necessarily vague, they may still be subject to judicial examination and review in case the judgment of the [NLRB] is arbitrary.").  The certification *vel non* resulting from a representation election under the Act, however, is subject to judicial review only in extraordinary circumstances.

---

[10]  Section 9(a) provides in relevant part: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit . . . ."  29 U.S.C. § 159(a).

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 305–06 (1943); *Int'l Ass'n of Machinists v. Trans World Airlines, Inc.*, 839 F.2d 809, 811 (D.C. Cir. 1988) ("[j]udicial review of NMB decisions is one of the narrowest known to the law" and "courts have no authority to review NMB certification decisions in the absence of . . . a gross violation of the Railway Labor Act"). Thus, the safeguard provided by judicial review available under the NLRA is not available under the Act. One reason for the unavailability of judicial review is that "[t]he Act puts a premium on speed of resolution" and section 2, Fourth is intended to ensure that representation disputes are not "dragg[ed] out . . . into other tribunals of law." *BRAC*, 402 F.2d at 204–05 (internal quotation marks omitted). By certifying an unstable (i.e., minority-supported) representative, the new rule heightens the risk of a disruption to interstate commerce, thus undermining a key purpose of the Act. 45 U.S.C. § 151a (one purpose of Act is "[t]o avoid any interruption to commerce or to the operator of any carrier engaged therein"); *see infra* note 13.

How the Board "reasonably decided," Majority Op. at 11, that continuing to require the majority of a craft/class of employees to participate would allow "an indifferent minority to prevent the resolution of a contest" escapes me. *Virginian Ry.*, 300 U.S. at 560. As already noted, the "indifferent minority" concern in *Virginian Railway* was that the 16 blacksmiths who did not vote could prevent the resolution of the representation contest in which the majority of blacksmiths *had* voted but had split their votes between two representatives, resulting in neither having received the votes of the majority of the craft/class. *Virginian Ry.*, 300 U.S. at 559–60. Accordingly, the Court ensured that the minority, indifferent or coerced, *id.* at 560, could *not* control the outcome by giving effect to section 2, Fourth's mandate that the majority of blacksmiths *participate* in the election. *Id.* In

contrast, under the new rule, the minority *can*—and will—control the outcome because the majority "of valid ballots cast" determines representation without regard to the majority participation condition.[11]

Moreover, the Board fails to explain why labor stability is no longer a relevant consideration for its new rule but remains relevant for its "showing of interest" requirement. The Board initiates a representation election for an unrepresented craft/class if it obtains authorization from 35% of the employees but it requires authorization from a majority of the employees to initiate a "decertification" election process for a represented craft/class. *See* 29 C.F.R. § 1206.2.[12] The Board bases unequal "showing of interest"

---

[11] As the ATA notes, under the Act, representatives are generally certified on a nation-wide or company-wide basis. Appellants' Br. at 35. By contrast, representatives under the NLRA are generally certified on a local basis. Because a certified representative under the Act represents all of an air carrier's pilots in the United States, the new rule would allow 100 pilots voting in Kansas City to force thousands of pilots nation-wide to accept representation. *Id*. at 35; *cf.* 29 U.S.C. § 159(b) (certification under NLRA generally by local bargaining unit).

[12] The regulation provides that

> (a) Where the employees involved in a representation dispute are represented by an individual or labor organization . . . a showing of proved authorizations (checked and verified as to date, signature, and employment status) from at least a majority of the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees under the provisions of section 2, Ninth, of the Railway Labor Act.
>
> (b) Where the employees involved in a representation dispute are unrepresented, a showing of

requirements for represented and unrepresented crafts/classes on the promotion of labor stability, namely, the need to prevent a rival union from raiding a represented craft/class. 75 Fed. Reg. at 26,078–79. But the challenged rule, coupled with the 35% authorization requirement for an unrepresented craft/class, practically ensures labor instability by securing support from only a minority of eligible employees.[13] Moreover, the elevated showing of interest requirement plus the Board's convoluted decertification process (which the majority opinion itself requires three pages to explain, *see* Majority Op. at 16–19) belie my colleagues' prediction that the majority of a craft/class "can *simply* call for a new election" if the Board certifies a representative based on minority determination. *Id*. at 9 (emphasis added).[14]

---

proved authorizations from at least thirty-five (35) percent of the employees in the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees under the provisions of section 2, Ninth, of the Railway Labor Act.

29 C.F.R. § 1206.2.

[13] The Board has recognized that

One need look no further than to the area of potential strikes to conclude that *certification based upon majority participation* promotes harmonious labor relations. A union without majority support cannot be as effective in negotiations as a union selected by a process which assures that a majority of employees desire representation.

*Chamber of Commerce*, 14 N.M.B. 347, 362 (1987) (emphasis added); *see also BRAC*, 402 F.2d at 203–04.

[14] My colleagues also insist on labeling the ATA's interpretation of section 2, Fourth's majority requirement as a "quorum

Finally, it is important to remember the Board's intended role in labor disputes and, once again, our *en banc* decision in *Railway Labor Executive's Ass'n* is instructive. Discussing the legislative history of the Act, the Court stated that, "[b]ecause mediation was considered to be the Board's primary function, Congress sought to delineate the Board's *other* roles in a manner that would avoid compromising its effectiveness as a mediator." 29 F.3d at 668 (emphasis added); *see also Ry. Labor Execs.' Ass'n*, 988 F.2d at 140 (citing *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 580–81 & n.13 (1971)) ("suggesting that Congress carefully composed RLA's provisions to preserve employees' confidence in the Board as a detached, impartial mediator"). The Board's challenged rule not only conflicts with section 2, Fourth but it also elevates the Board's rule-making function at the expense of its primary function as unbiased mediator. By imposing minority rule in representation elections, the Board

---

requirement." Majority Op. at 7, 8, 10–12, 16. Although I believe their lengthy quorum requirement discussion is a distraction, I remind them of the Supreme Court's recent holding in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010). In determining that the NLRB must maintain a membership of at least three to delegate its authority, the Court emphasized that "[a] quorum is the number of members of a larger body that *must participate* for the valid transaction of business." *New Process Steel*, 130 S. Ct. at 2642 (emphasis added). The "quorum" that "must participate" under section 2, Fourth is the majority of a craft/class of employees. *Cf. id*. at 2644 ("The requirement of a quorum is a protection against totally unrepresentative action in the name of the body by an unduly small number of persons[.]" (quoting Robert's Rules of Order § 3, p.20 (10th ed. 2001))).

has put itself squarely on the side of representation and thereby abandoned its legitimate role.[15]

For the foregoing reasons, I respectfully dissent.

---

[15] Because I believe the new rule fails under both steps of *Chevron*, I see no need to address the ATA's protests regarding the deficiencies in the Board's rule-making process. *See* Majority Op. at 13–24. My silence, however, does *not* indicate acquiescence in that portion of the majority opinion.